Our final case for the morning, Beers v. Attorney General, Appellate No. 17-3012. May I proceed? Let's just give you an answer. Why don't you stand, check, and take his seat. All right, Counselor. All righty then, you may proceed. May I proceed? Thank you. May it please the Court, my name is Michael Gottlieb. Excuse me, I represent Bradley Beers. I'd like to reserve three minutes for rebuttal if the Court would so allow. Back in December of 2005, Bradley Beers was a Civil War re-enactor. As such, he had what we call anti-firearms. Anti-firearm is not fired by the same type of firearm that we would all think of. It's fired with a cap and ball or a, I'm sorry, a... We're well aware of the facts here of his involuntary commitment. How do you get around the analysis that we have put forth in our case law regarding his situation at the Mazzarella steps 1 and 2? First of all, with respect to Mazzarella, I would suggest to this Court that Mr. Beers does fall within the parameters of the Second Amendment for the first step of the analysis. My reasoning there is such that Mr. Beers is not mentally ill. And the Mazzarella analysis, which of course dealt with criminals who made a conscious choice to commit crimes, Mr. Beers did not make such a conscious choice. Mr. Beers... But the disqualifying event is the involuntary commitment, and the disqualifying event in the felony situation is conviction. There's a parallel here with respect to the two different types of disqualifying events, is there not? They're both presumptively... Well, there's a parallel but a distinction, and the distinction is that Mr. Beers' condition was a medical condition, and the medical community recognizes a mental illness, in this case a depression, as a medical condition, not a criminal conviction. This is something that's curable. It's not somebody such as a paranoid schizophrenic who, although can be in remission, is basically not curable. I'm representing a number of criminals in that aspect. Mr. Beers... They're defendants, not criminals. That's all right. They become criminals once they are convicted. All right. So they are criminals at that point. And they made a conscious choice to break the law. Now, there are some who break the law because they are reckless. For example, an assailant on a condition where... Of course, Marzarella isn't dealing with a conscious choice to break the law. Marzarella itself deals with the possession of a gun without a serial number, where the serial number has been obliterated. So the first Marzarella case is not really a distinction between whether someone has committed a voluntary act or not. It's a question about, is this condition or is this activity protected by the Second Amendment? And if we look at the historic basis of denying guns to people who are mentally ill, it would seem clear from history and from what the Supreme Court said in Heller, for instance, that mental illness is a bar to the Second Amendment right to possess a firearm. Well, that is what the Heller court said. But what the Heller court said is that a mental illness is, this is not a gentleman who is mentally ill, and that's the key here. But the statute that we're looking at has mental defect or someone who's been civilly committed. Yes, that's correct, Your Honor. The challenge I think you might have is someone who's been civilly committed has been adjudicated by a judicial officer as a danger. And the historical record demonstrates that the dangerous individuals at the time of the ratification were not even given their freedom. Judges could act. So how do you distinguish your client's circumstance where he has a judicial determination of danger? Well, he had a judicial determination of danger back in 2005. So you want us to rely on passage of time and rehabilitation? Yes, of course. Binderoff says we can't. Binderoff says we disavow what we said in Barton. That's not the test. The test is we look at what happened at the time. We look at the nature of the involuntary commitment. We look at the nature of the conviction. Now, if he was involuntarily committed for crossing the street against the light, that would be a different thing. But here there was a serious situation when he was involuntarily committed. So how do you get rehabilitation? I mean, there is a provision. Congress has enacted a provision whereby the states can adopt a methodology, and 33 states have enacted these qualifying programs to permit someone to get relief from this disability. Pennsylvania happens to not be one of them. That is correct, Your Honor. They've advanced the legislation. It's got as far as a second reading. I believe I mentioned in your briefing. Maybe there's a lobbying effort that needs to be done by your client, but there is a way around this. But our court jurisprudence and the method that we're supposed to reason through these doesn't take that rehabilitation or that current situation into account. Actually, with respect to Binderoff, these were criminals who had criminal convictions, and I believe there's a distinction when somebody makes a voluntary decision to break the law. This is not a gentleman who made a voluntary decision to break the law and thus become disqualified as a felon. But there hasn't been that distinction. I mean, the presumptively valid category listed includes convicted felons and those with mental disturbances, the commitment. So I don't think a voluntariness has been used in our jurisprudence to make a distinction. Well, Your Honor, the jurisprudence also discusses the virtuous people and whether somebody is virtuous enough to own or possess firearms. In these cases, Binderoff, Mazzarella, Barton, and so on, the criminal defendants, the criminal who they were convicted, are no longer virtuous because of their voluntary choice to commit a crime. Well, but couldn't they say later after they're doing missionary work, you know, after they get out of jail, and they should be deemed to be virtuous again, much along the same line as you would say the rehabilitation or the fact there's no longer mentally ill, but that's not really something that we look at. Well, they can do that, and I realize that's what some of them have done in Binroff and Suarez. I'm aware of that. But Mr. Rob Beers is in a different situation. This was a, let's call it a snapshot in his life. It wasn't a continuous process. He was diagnosed as depression. This was a statute that was written and passed, written in 1966, I believe, passed in 1968. The medical community has long since looked upon mental illnesses differently. For example, when the district court, the Eastern District closed certain state hospitals, put restrictions on state hospitals because they weren't treating the mental ill properly. And now we are in a situation where we have psychiatrists who examine Mr. Beers. In fact, a Jefferson psychiatrist examined him on two different occasions and determined that he is not mentally ill. The problem is, though, the Bindroff-Mozarella standard requires us first to look at what the ratifiers would have thought about at the time. And if the ratifiers were thinking about those who are dangerous, circumstances could cause them to lose their liberty and, by extension, lose access to firearms. Does your client fall into that class? He's been adjudicated a danger through the civil commitment. You're asking us to say post-adjudication takes him out of it, but we have the language in Bindroff that says we're overruling Barton that gave any kind of latitude. So aren't our hands tied? We're sympathetic to your position. No, I don't believe your hands are tied because this case is distinguishable from Bindroff and the overruling of Barton. This case has to deal with an individual 12 years ago having mental illness. It's a medical condition. He has lived an exemplary life since, and I believe the court should get to that. We went to state court and obtained state registration. We were completely aware of that. So at this point, I would suggest to the court that he is a virtuous individual, and I suggest also to the court that the first part of the test, he does satisfy the first part of the test, and we then look to the second part of the test. We only get to the first second. He only satisfies the first part if we accept that we can consider what you're asking us to consider, which is his current state of, his current state. Okay, the second part of the test then goes to the means and scrutiny. Does it satisfy intermediate scrutiny? How would you say we could evaluate that on this record? This was a motion to dismiss. Well, it's only on a motion to dismiss, and that's part of the problem, and that's why I would suggest the case would need to be remanded back to Judge Davis for a trial on the merits, for discovery and a trial on the merits. You plead certain things, which is what we've pled. Obviously, they're accepted as true for purposes of, you know, the motion to dismiss. But we then go back to the trial court, and the trial court makes a determination as to whether Mr. Beers can distinguish himself from other people in that same situation. There are a host of mentally ill individuals, men and women, boys and girls, who cannot distinguish themselves because, A, they're still treating. B, they still have serious mental illnesses. C, they've manifested not mental illnesses. They hear voices. They see. But, again, you would be asking the district court to act different than what Binderup has told us, which is you can't consider these post-event rehabilitation. Well, but that's for purposes of the second. That's how he distinguishes himself. But we don't get to the second until we pass the first. That's correct, Your Honor, and I would suggest to the court that we do get past the first step in this particular case. And then on the second step, we're not talking about the second. I'm talking about means and scrutiny. Yes. Your position is the record isn't sufficient for us to be able to determine whether the government has induced sufficient evidence to show compelling evidence. No, because we haven't gotten that far. Right. I just want to make sure that I understand you're not accepting that maybe you are. The government cites a number of studies in their briefing, but you're not here saying I accept what they say. No. First of all, the government's studies, and I reread them this morning just to be certain that I wasn't misreading them, but they had to be the people who are mentally ill, not somebody who had a mental illness in the past. Okay, but you're asking us to go back and read studies that aren't in front of us, right, other than they'd be cited in the briefs. I'm sorry. The only way we could discuss this subject is you would be asking the court, go and read the studies the government cited. Right, and I've read a number of those studies. As a good lawyer should do. Yes, and every one of those studies has to deal with somebody who is currently mentally ill, such as other clients of mine. This gentleman is not mentally ill. That's what Judge McHugh in Bucks County determined, because he never would have given his firearm, his state's rights back. Of course, we know that's not the end, because there is no, as I believe Judge John Delvin mentioned, the NICS Improvement Act provided funds for the state to give him a pathway for restoration, and he's been unable to go that route simply because our legislature, for whatever reason, determined that they weren't going to do that. All right. Thank you, Counsel. We'll see you in rebuttal. Thank you, Your Honors, and may it please the court, Tice Walters for the government. Plaintiff is barred from possessing a firearm because he was committed to a mental institution based on a judicial finding that he posed a clear and present danger to himself or others due to severe mental illness. Although he now argues that that prohibition is unconstitutional, as Your Honors' questions earlier made clear, this court in Binderup has already explained that the Constitution does not require an ongoing particularized determent of present dangerousness at step one of the Marzarella inquiry. The Supreme Court in Heller made clear that it was not casting doubt on longstanding, presumptively lawful regulations on prohibition of firearms by the mentally ill, and the burden under Binderup is on plaintiff to come forward with a strong showing at step one of the Marzarella inquiry. How about the historical justification? You really can't equate involuntary commitment with conviction as a fell enemy, convicted felons have lost all kinds of rights, property rights. Once you're convicted as a felon, and this historically, you're deprived of all kinds of rights. That's not the same. In fact, involuntary conviction was not even known to be, there was no such institutionalization at the time of the revolution and the founding of the country. Was there? Well, Heller made clear, Your Honor, no, there was no civil commitment procedure, Your Honor, although as we pointed out in that brief, there was plenty of precedent for removing people who were judged to be severely mentally ill from the community. But Heller makes clear that the Second Amendment right is focused on law-abiding, responsible citizens, and it singles out as two groups of people that were not viewed at the time of the framing as able to responsibly handle firearms as felons and the mentally ill. So you're saying because he's mentally ill, he's not law-abiding? No, the responsible part, Your Honor, not law-abiding, that he could not be trusted to responsibly or not trusted, Your Honor. He could not be judged by the community at the time of the framing as able to responsibly handle firearms. But was there an intention, kind of like the Tyler Court in Sixth Circuit was concerned about, was there an intention that there be a lifelong ban similar to what happens with convicted felons? Once you're convicted as a felon, too bad. Same here, once you, you know, even though you were risky at some point, too bad. Lifelong ban, was that an intention of denial of rights similar to convicted felons? This court in Binderich, Your Honor, made clear that there is no historical evidence for the idea that the passage of time or of rehabilitation can restore lost Second Amendment rights. And there's no question, no one's- Well, I'm not going at it from that standpoint. I'm going at it from the standpoint, was it clear that, I mean, looking at this historical justification, was it clear that a lifelong ban was to be imposed against people who were once perceived to be risky? Well, Your Honor, I think that my friend on the other side suggests that it was inconclusive whether or not it was. And under Binderich, that's enough to lose this challenge because Binderich says that he must make a strong showing. So the fact that there's no evidence that anyone has ever historically been able to regain lost Second Amendment rights is sufficient. Obviously, we don't have a lot of historical evidence looking at people's conception of regaining Second Amendment rights over the years. But I would emphasize that burden. And the question here really is one of what is the appropriate proxy? Congress identified involuntary commitment by a state judicial officer because someone, in this case, was judged to be a danger to themselves or others due to severe mental illness and said that that was a proxy for the mental illness that the Supreme Court specifically identified in Heller. As the First Circuit in Rolando made clear, that's entirely reasonable to have piggybacked in that way on the findings of a state judicial officer. How do you get around the fact that if we were to rule in your favor, we'd be splitting from Tyler? Well, Your Honor, Tyler, as we pointed out in our brief, that's first a deeply fractured opinion, and then second, the analysis in the Sixth Circuit is already quite significantly different than this court in terms of the burden placed. It's different? I thought they used a very similar – please educate me on this. I was under the impression that it uses a very similar framework as Mazzarella. They do use a two-step framework, Your Honor, but they deal with the presumptively lawful regulations as a thumb on the scale at step two under the scrutiny rather than as this court does in step one, and the burden is also reversed on step one. I guess another distinction might be that Mr. Tyler was not a person in a history of suicide risk, and so factually it's different, right? There are some factual differences. Obviously, we don't think that you necessarily need to be looking at the actual conduct, but if this court were to, I think that the conduct that led to Mr. Beer's involuntary commitment is very much at the heart of what Heller was trying to get at there. But I gather it's your position on that the historical record is sufficient that, at least at the time of the ratification, judges were able to incarcerate, deprive liberty of those who were dangerous? That's certainly right, Your Honor. Yes, there was a strong historical tradition of – step one of step one. Absolutely, Your Honor. We did cite some sources. I think the Gansey case cites some others from the First Circuit, just showing that when someone was judged to be a danger to the community, that justices of the peace were historically entitled to take measures to remove them from the community. And you're asking us if, by implication, then we should be able to infer that they would also be able to remove them from being – have access to dangerous items? Absolutely, Your Honor. I think it follows awfully well. If the court has no further questions, we're happy to rest on our brief. I have one other question I want to ask you about. Of course, Your Honor. Tell me whether this distinction matters. 922G1 is our felon in possession statute. 922G4 is the involuntary commitment provision we're focused on here. Is there a distinction in your mind, and I'll have the same question for your adversary. Someone who's been involuntarily committed has been deemed a danger to self or others. But not all felons, necessarily, are a danger to self or others. Is that right? That's correct, yes. As an individual matter. If that's the case, that anybody who's been involuntarily committed by a judicial officer with due process, which we have no contention that didn't occur here, has been deemed a danger, they're actually in a narrower category than the G1 felons. I think that's right. I think that this is an extra – G4 is a very narrow provision, and it is particularly narrow when combined with the Pennsylvania statute here, which, as you mentioned, does have specific findings of being deemed a danger to self or others. So, yeah, I think that's correct. And so does that, from your point of view, does that put him more in the category of the persons of the Second Amendment? The ratifier is meant to not include to have Second Amendment rights? Exactly right, Your Honor. I think it's an even easier case than the G1 case for being outside the scope of the Second Amendment. Thank you. Thank you, Your Honor. Would you take issue with the way Judge Davis decided this case in terms of his analysis? I think his basic analysis was correct, Your Honor. I think it was correct. But he read so much into the presumptively valid concept. Did he actually follow our jurisprudence? Well, I don't think the fact that something is presumptively valid settles it, obviously, Your Honor. But I think he relied very heavily on this Court's discussion and binder up of the importance of passage of time and rehabilitation for restoring Second Amendment rights. I think that's exactly the right way to handle this case, as well as the idea that, of course, both historically and as identified in Heller, individuals with severe mental illness were deemed to be outside the scope of the Second Amendment. Thank you very much for your argument, counsel. Mr. Gottlieb, I know you have some points. I'll let you go. I have the one question I asked, or I'm sorry, I have for you, too. So you have the floor. All right. First of all, with respect to a question that Judge Rendell asked that I don't believe my colleague was able to respond to, there is no evidence that mental health adjudication was meant to be a lifelong ban. I think the Gun Control Act of 1968 was a very all-inclusive knee-jerk reaction to some very, very serious events that had occurred, the assassination of President Kennedy, the assassination of his brother Robert Kennedy, Martin Luther King's killing. Congress went through a lot of trouble to get something through very quickly, and I think if we would look at that same type of statute today, it would be significantly different. But that's my postulating. But isn't there a series of mass shootings today by persons who are mentally ill? Yes, and the key there is there are people who are mentally ill, and my client is not mentally ill, and that's the distinction. But there are people who don't necessarily show through their activities and everyday living that they are mentally ill. You can't look at them and say that person is mentally ill. That's one of the serious problems that if there has been an adjudication of involuntary commitment, there has been a study that indicates that that person has had at least at one point a condition which is a danger to himself and or the community, and that mental illness is not something that you can determine by simply looking at a person, and mentally ill persons are a danger to the community. Well, actually, Your Honor, a lot of the mentally ill people are very easy to pick out. I do a lot of criminal defense work, and it's relatively easy to pick out somebody who has a mental illness. There are some that are much more subtle mental illnesses. Those are not necessarily the dangerous people. However, you talk about the mass shootings. There were all sorts of warning signs with respect to those shooters, and I think there's been five or six in the last number of years, and there were all sorts of warnings. Social media, the courts failed to report the one in Virginia. The court in Virginia, whoever had jurisdiction, never reported it to Virginia. They had the NICS system as opposed to our PICS system. It was never reported. That's why he was able to walk into a gun shop and buy a gun. Those are administrative failures. The same thing, I believe, at Fort Hood in Texas. That was a gentleman who never should have owned a gun because he had a mental illness. There are some who are diagnosed and are never committed, and the key, of course, is the commitment, but people often miss the key signs. I'm kind of more in tune to them. I believe the Tyler case in the Sixth Circuit is very instructive to this court because they did file a Nazarella, although they used different terms, and they used a reverse. I believe they reversed how they did it, but they still reached the same result, which was 922G4 was unconstitutional as applied and only as applied to Mr. Tyler, and it was unconstitutional because that state had no pathway under the NICS Improvement Act. They hadn't bothered to pass it. He was suffering from a major depression as a result of a divorce. But he wasn't a suicide risk. I don't recall that being in the record anywhere. Well, that's part of the reason why the court rejected the government studies is because they were mostly people who were suicide risk, and so by implication Mr. Tyler and Mr. Beers are different. I would like to ask you, though, a question that I had asked your adversary about. Should we take anything from the fact that 922G4 involuntary commitment, if you fall into that category, and I'm not looking at the mental defect part. I'm only looking at an involuntary commitment. There's been an adjudication of danger to self or others. 922G1 felons, some are dangerous to self and others, and some maybe are not. Isn't G4 actually a very narrow restriction on a narrow group of individuals because of danger? Or are you saying that's not a relevant distinction? There is a distinction, and there's a distinction because mental illnesses, I'll use the term fluid even though that may not be the correct term. Somebody can be mentally ill because they suffer from a depressive episode. I want to stay focused on a specific type, someone who's been adjudicated danger to self or others. I don't want there to be a misimpression about our views about mental illnesses as a general matter and what that means. We're looking at a judicial determination of danger to self or others as a result of a mental circumstance. But it's that narrow. I want to be sure we're using very tight language here. It is narrow, and in Pennsylvania, with respect to the 302 commitment, the initial, there is no due process there. But eventually he's got the 128. Yes, I'm not disagreeing. Eventually he received due process in the 303 and the 304. But there's no mechanism beyond that to do anything to have a course of the right restored. I understand your position. My question was much narrower, and this is the last question we'll have for you. Is this distinction I'm drawing between 922G1, the category of people carried by that, and 922D4 different based upon an adjudication of danger? Does that make a difference? No, I don't think it does. Thank you. Thank you very much. All right. Counsel, thank you, like your colleagues before you, for the fine arguments and the excellent briefing. We will take this matter as well under advisement.